**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**PHILIP C. GALBO and**<br>**LARRY SOLBERG,**<br><br>**Defendants.** | **CIVIL ACTION**<br>**NO. 07-245-S** |

**AMENDED COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission") alleges that:

**SUMMARY**

1. This case concerns incorrect accounting by CVS Caremark Corporation ("CVS"), a national chain of pharmacy and retail merchandise stores and a pharmaceutical benefits management company, for a transaction (the "Transaction") that senior executive Phil Galbo ("Galbo") negotiated and the accounting for which Larry Solberg ("Solberg") approved. As accounted for, the book value of the excess plush toy inventory, such as seasonal stuffed animals, was not reduced in connection with the Transaction. As a result of recording the Transaction in this manner, CVS materially overstated its pretax earnings for the third quarter of 2000 by approximately $18.1 million (approximately $10.8 million after tax), or approximately 7% of net income for the third quarter of 2000.

2. During the late spring and summer of 2000, Galbo and Solberg became aware that CVS was carrying the plush toy inventory on its books at $32 million, a value higher than $13.9

million, the inventory's approximate market value at the time. Instead of writing down the value of the inventory to market value, CVS entered into the Transaction with a barter company pursuant to which CVS contracted to exchange the plush toy inventory for credits with a face value of $42.5 million. CVS then replaced the $32 million toy inventory on its books with the credits at a value of $42.5 million.

3. Rather than exchange a set of goods or services with CVS, the barter company received no goods or services from CVS. It received $12.5 million in cash. Under the terms of the deal, the barter company transferred the $42.5 million in credits and CVS liquidated the inventory in its capacity as agent for the barter company while guaranteeing the barter company $12.5 million. CVS valued the credits on its books at their full face value of $42.5 million.

4. Evidence existed that the credits should not have been recorded at their face value. The credits consisted of $18.8 million in telecommunications credits and $23.7 million of credits with the barter company. Although CVS could have theoretically applied the telecommunications credits to pay its own telecommunications bills, CVS used a different telecommunications provider, thereby making the credits harder for CVS to utilize, and arguably of lesser value. The terms of the Transaction also were such that CVS could not use the $23.7 million in barter company credits alone to purchase more goods from the barter company. Rather, the terms of the barter credit agreement were such that the ratio of barter credits in each transaction would vary from transaction to transaction, subject to mutual agreement between CVS and the barter company, but would generally be a 60-75% cash and 25-40% barter credit configuration.

5. Finally, even if CVS had properly transferred the toy inventory to the barter

company, GAAP required (a) that the toys be written down to their fair market value prior to entering the Transaction and (b) that CVS disclose the existence and certain details of the Transaction. CVS neither recorded the required write-down in the value of the toys nor properly disclosed the Transaction in its financial statements. Failing to reduce the book value of the toys to their market value had a material effect on CVS's financial results for the third quarter of 2000 (although not on CVS's financial results for the 2000 fiscal year).

6. By engaging in the transactions and practices alleged in this Complaint:

a. Galbo violated Section 17(a)(2) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; and

b. Solberg violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)].

## JURISDICTION

7. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].

8. The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and (e) of the Securities Act [15 U.S.C. § 77t(b) and (e)].

9. In connection with the conduct alleged herein, Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, the facilities of national securities exchanges, and/or of the means and instruments of transportation or communication in interstate commerce. Activity described in this Complaint occurred primarily in the State of Rhode Island.

## DEFENDANTS

10. Philip C. Galbo, age 56, is a resident of Gladwyn, Pennsylvania. Galbo, who is not an accountant, was treasurer of CVS during the relevant period.

11. Larry Solberg, age 58, is a resident of Holmes Beach, Florida, and former controller of CVS. He is a certified public accountant whose license in the state of Minnesota is inactive. He was the principal accounting officer at CVS during the relevant period.

## FACTS

### I. Plush Toy Sales Are Down Posing a Threat to CVS's Achieving Its Financial Goals

12. At year-end 1999, CVS determined that its plush toys should be held over for the following year at full book value. Subsequently, in April and May 2000, CVS analyzed the status of its plush toy programs, which it had determined to terminate. The analysis revealed, among other things, that projected sales were less than the cost at which CVS was carrying the toys on its books and that the rate at which certain lines of plush toys were selling was low in comparison to historical rates and sales rates on other products. One then CVS vice president (the "CVS vice president") informed Solberg, the then controller, that poor sales were a potential threat to CVS achieving its gross margin goals for 2000.

13. During the summer of 2000, the value of the plush toys continued to decline according to some internal reports. Both Solberg and Galbo were sent a written analysis on August 25, 2000 that projected sales of $13.9 million for the $32 million (at cost) of plush toy inventory. In addition, in September, CVS agreed to liquidate 18% of the inventory at fourteen cents per dollar of cost. Ultimately, CVS realized approximately $12 million on the liquidation of the plush toy inventory.

14. Throughout the summer of 2000, Solberg received documents indicating several threats, including the plush toys, to CVS achieving its financial goals. Galbo stated to his contact at the barter company that CVS's independent outside auditors had indicated that if the plush toy inventory were not sold, CVS may be facing some possible write-downs.

## II. CVS Takes No Charge to Reflect the Toys' Impaired Value, But Instead Enters Into The Transaction

15. To address the potential plush toy issue, Galbo, who was not involved in accounting for the Transaction, began negotiating the Transaction on CVS's behalf in or around May 2000. Galbo received an email from another then CVS executive which stated that avoiding markdowns on the plush toys through the proposed Transaction was "a major element of fixing [CVS's] significant profit gap." The value of the toys as reflected on CVS's books was $32 million, but reports circulated to Galbo and Solberg indicated that their actual fair market value was much less. Solberg also reviewed and presented periodic reports to senior management that suggested the failure to close the Transaction was a potential threat to CVS's financial goals. Indeed, some of these reports, generated in September 2000, stated that there was "no margin for error" in achieving the consensus target for the third quarter 2000 and that management was to continue to "manage and monitor" a number of risk areas, including the proposed Transaction. Galbo received at least one such copy of the September 2000 report.

16. On the last business day of CVS's third quarter 2000, after evaluating and presenting various transaction alternatives involving multiple entities, Galbo executed a letter of intent concerning the plush toy inventory with a barter company with which CVS had previously done business. Pursuant to this Transaction, CVS paid the barter company $12.5 million

(referred to as a guaranteed liquidation fee) in return for (a) a coupon entitling CVS to $18.8 million of phone services with a vendor that CVS did not use and (b) barter credits entitling CVS to $23.7 million of discounts off purchases of future unspecified goods and services from the barter company. In the Transaction, CVS also undertook to transfer title of the toys to the barter company, but the agreement left CVS with the risks and rewards of, and responsibility for, selling the plush toys, and CVS at all times retained physical possession of them.

17. Nonetheless, CVS accounted for the Transaction as if it had transferred the toys to the barter company. Through a series of journal entries, CVS effectively replaced the $32 million plush toy inventory with coupon/barter credit inventory at its face value of $42.5 million. The effect of replacing toy inventory with coupon/credit inventory was that - at least on its books - CVS no longer owned a plush toy inventory that had a market value that was less than its book value. Accordingly, it did not take the appropriate impairment charge. In addition, on September 30, 2000, CVS reversed $3.5 million of markdown expenses it had taken on a portion of the plush toy inventory during the summer months. By doing so, CVS not only retained the benefit of the cash generated by the summer sales of some of this inventory at marked down prices, but also, for purposes of markdown expense, treated the previously sold toys as if they had been exchanged to the barter company in return for credits. Solberg was aware of the reversal of markdown expense, but he did not know that a portion of the markdown reversal had been applied to previously sold toys. In connection with the year-end audit for 2000, Solberg discussed the Transaction with CVS's independent outside auditors. Based on the internal reports he received earlier in the year, Solberg should have known of the decline in the toys'

value relative to their cost and discussed that with the independent outside auditors, but he did not.

## III. Galbo and Solberg Should Have Known That the Toys Should Have Been Written Down at the End of the Third Quarter

18. Both Galbo and Solberg should have known that not taking an impairment charge to the plush toy inventory was incorrect. Each was exposed to red flags that signaled the error of not taking that charge. For example, each reviewed the contracts that showed that CVS retained responsibility for liquidating the plush toys, retained the risk of their loss, and retained to some extent the rewards of their sale. Moreover, based on the internal reports that were circulated to them, each should have known that CVS's internal estimates of plush toy sales were far less than the pre-September 2000 book value and far less than the combined face value of the credits and phone services coupon received from the barter company. Just days prior to the Transaction, Galbo wrote a memo which Solberg received, in which he acknowledged, "We need to cover $41.5 MM of margin with only $12MM of inventory market value." Indeed, the CVS vice president, who was not an accountant, expressed to Solberg and Galbo that she thought the Transaction was "a little screwy" because it seemed to allow CVS not to take markdowns to inventory. The CVS vice president also expressed to Solberg her lack of understanding of how anyone would pay CVS so much for something the CVS vice president could not see value in.

19. With respect to Solberg, there were other red flags. The CVS vice president asked Solberg whether it would not be more appropriate to reduce the book value of the plush toy inventory first and then engage in the Transaction. Solberg should have known that CVS had not yet identified any uses for the barter credits or phone services coupon, should have known CVS

had no experience retrading credits or coupons to third parties, and received other information casting doubts on the idea that the coupon and credits were worth their face value.

20. Galbo, too, was exposed to a number of red flags from which he should have known that the credits were not worth their face value. For example, the phone service coupon was issued by a telecommunications provider CVS could not use due to its contractual commitments to its own provider and therefore would need to be retraded to achieve value for CVS. Although Galbo was reassured by his barter company contact that the telephone credits could be placed, Galbo knew that (a) CVS had no history retrading coupons, (b) no CVS vendor had committed to accepting the coupon, and (c) only four of CVS's top fifty vendors were current users of the telecom provider (and those four in very small amounts). CVS nevertheless recorded the coupon at face value. Furthermore, in July 2000, Galbo acknowledged that absent assurance of current or future vendors' acceptance of them, trade credits offered by a different barter company would most likely have to be "significantly discounted" if CVS elected to pursue a transaction with that company. Though no such guarantee existed with respect to the barter credits that CVS ultimately acquired from another company, and although his contact at that barter company informed Galbo that it did not normally issue barter credits and noted some potential risks of barter credits versus a direct asset exchange, CVS also recorded the barter credits at face value. CVS ultimately utilized a majority of the credits and wrote down the balance in 2003.

**IV. Galbo and Solberg Cause CVS to File False Financial Results for the Third Quarter 2000 That Are Repeated in the Year-End Results and Incorporated By Reference in Filings Related to a June 2001 Offering.**

21. As a result of the foregoing, CVS did not provide in its financial results for the third quarter of 2000 for the reduction in value of the toys from their book value of $32 million to their projected market value of $13.9 million. Accordingly, its pretax earnings for the third quarter were overstated by approximately $18.1 million (the amount of the impairment), and after tax earnings were overstated by approximately $10.8 million, or approximately 7% of net income. These overstated results were also made part of CVS's filing for the year-end 2000 which were in turn incorporated by reference in filings in connection with a June 2001 secondary offering of securities by CVS. As principal accounting officer, Solberg signed the year-end 2000 filings.

22. Both Galbo and Solberg received bonuses for year-end 2000 that were tied to CVS's financial results. The failure to reflect the reduction of the value of the toys therefore caused each to receive a higher bonus than he otherwise would have. In addition, Galbo received additional discretionary bonuses explicitly tied in part to work on the Transaction and its benefit to CVS's bottom line.

**FIRST CLAIM**
**(Both Defendants )**
**Violation of Securities Act § 17(a)(2)**

23. Plaintiff Commission repeats and realleges paragraphs 1 through 22 above.

24. The negligent conduct of Solberg and Galbo described above resulted in CVS's materially false and misleading statements for third quarter 2000 that were repeated in year-end filings, which were incorporated by reference in a June 2001 offering of securities.

25. By reason of the foregoing, Galbo and Solberg, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities negligently obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Commission respectfully requests that this Court issue a Final Judgment requiring Solberg and Galbo to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] in an amount to be determined by the Court and other equitable relief as the Court deems appropriate.

Respectfully submitted,

/s/ R. Daniel O'Connor
R. Daniel O'Connor
Senior Trial Counsel
oconnord@sec.gov

Scott D. Pomfret
Branch Chief
pomfrets@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 23rd Floor
Boston, MA 02110
(617) 573-8979
(617) 424-5940 fax

Dated: July 2, 2007